UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

                                    Case No. 8:10-bk-07228-MGW

Kathy D. Dowell,                            Chapter 7

       Debtor.

_____/

**MEMORANDUM OPINION AND**
**ORDER ON TRUSTEE'S OBJECTION TO EXEMPTIONS**

Like most states, Florida allows a personal property exemption for "professionally prescribed health aids."  A device that attaches to the steering wheel of a motor vehicle qualifies as a health aid when it is uniquely suited and principally used to mitigate a disabled driver's physical impairment and restore the functionality of driving.  The vehicle itself may be exempt if it is uniquely suited and primarily used for transportation to and from essential medical care.  Simply attaching a steering wheel device, however, will not by itself transform the entire vehicle into a health aid when the device can be easily removed and transferred to any functional vehicle.  For that reason, and as is more fully discussed below, the Court will overrule in part the Chapter 7 Trustee's Objection to the Debtor's Exemptions as to the steering wheel device, and it will sustain the Objection as to the motor vehicle itself.

**Factual and Procedural Background**

This chapter 7 case was filed on March 30, 2010.  In her schedules, the Debtor listed a 2007 Chevrolet Impala LS ("Vehicle") with a value of $10,200.  The Vehicle is unencumbered.  Immediately following the description of the Vehicle in the Debtor's Schedule B is the notation,

"Dr. Prescribed medical aid to assist Debtor as she is disabled."[1]  The Vehicle was also claimed as exempt in Schedule C[2] under section 222.25(2), Florida Statutes, which provides for the exemption of a "debtor's interest in any professionally prescribed health aids."

The Debtor justifies her claim of exemption for the Vehicle on the basis that shortly before the filing of her case, she had installed on the steering wheel a device known as a "spinner."  A spinner is a knob affixed to a steering wheel to amplify the rotational force exerted by a driver.  Indeed, the Debtor, who is disabled, no doubt benefits medically from using the spinner to assist her in driving the Vehicle.

The spinner, however, was attached to the Vehicle's steering wheel only one month prior to the filing of this case.  The Debtor originally acquired the vehicle on October 20, 2008.  Since then, she has used it as her primary means of transportation.  On January 11, 2010, the Debtor, at her bankruptcy counsel's suggestion, obtained an appraisal, which valued the Vehicle at $10,200.  It was only following that appraisal, and after consulting with her counsel, that the Debtor obtained from her physician a prescription for a "Steering Wheel Spinner Device."  Thereafter— and some 16 months after she originally acquired the vehicle—the Debtor attached the spinner to the Vehicle and then shortly afterward filed her chapter 7 petition claiming the entire vehicle was exempt as a "professionally prescribed health aid."

The chapter 7 trustee ("Trustee") objected to the Debtor's claim of exemptions on the basis that the "vehicle was not distinctly suited or primarily used for a medical purpose and did not have a prescriptive device (a knob on the steering wheel) attached to it or prescribed until after the [D]ebtor had the vehicle appraised in preparation for her bankruptcy filing."[3]  The Court

---

[1] *Schedule B – Personal Property* (Doc. No. 1, at 11).

[2] *Schedule C –Property Claimed as Exempt* (Doc. No. 1, at 13).

[3] *Trustee's Objections to Debtor's Exemptions* (Doc. No. 12) ("Trustee's Objection").

initially sustained the Trustee's Objection.[4]  But the Debtor then moved for reconsideration of that Order.[5]

## Conclusions of Law

The Court has jurisdiction over this contested matter under 28 U.S.C. § 1334 and Fed. R. Bankr. P. 4003(b).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

### A.  Statutorily Exempt Property

Bankruptcy Code section 522(b) allows debtors to exempt certain property from the claims of their creditors.  The purpose of these exemptions is to facilitate a debtor's "fresh start" after bankruptcy.[6]  Specifically, the exemptions are for "property useful to the debtor's continued survival."[7]  As such, these exemptions must be liberally construed in favor of providing their benefits to debtors.[8]  Moreover, "[a] debtor's claim of exemption is presumptively valid, unless a party in interest objects."[9]  If a party does object, then under Federal Rule of Bankruptcy Procedure 4003(c), "the objecting party has the burden of proving that the exemptions are not properly claimed."

Bankruptcy Code section 522(d) specifies the exemptions that debtors may take "unless a state otherwise designates the specific exemptions available to debtors residing within [that] state."[10]  Florida has "opted out" of the federal exemptions, so Florida debtors are allowed "only

---

[4] *Order Sustaining Trustee's Objection to Property Claimed as Exempt* (Doc. No. 13) ("Order").

[5] *Motion for Reconsideration of Order Sustaining Trustee's Objection to Debtor's Claim of Exemptions* (Doc. No. 18) ("Motion for Reconsideration").

[6] *U.S. v. Sec. Indus. Bank*, 459 U.S. 70, 83 (1982) (Blackmun, J., concurring).

[7] *In re Larson*, 143 B.R. 543, 546 (Bankr. D. N.D. 1992).

[8] *In re Gatto*, 380 B.R. 88, 91 (Bankr. M.D. Fla. 2007) (citation omitted).

[9] *In re Mootosammy*, 387 B.R. 291, 295 (Bankr. M.D. Fla. 2008) (citing 11 U.S.C. § 522(l)).

[10] *In re Puff 'N Stuff of Winter Park, Inc.,* 183 B.R. 959, 960-61 (Bankr. M.D. Fla. 1995) (citing 11 U.S.C. § 522(b); *Rhodes v. Stewart*, 705 F.2d 159, 162 (6th Cir. 1983)).

those exemptions permitted under Florida law."[11]  Thus, Florida law both provides for and

determines the extent of any exemptions that Florida debtors may claim.[12]

 Section 222.25, Florida Statutes, specifically exempts certain personal property "from

attachment, garnishment, or other legal process."  In 1993, Florida added subsection (2) to

include "[a] debtor's interest in any professionally prescribed health aids for the debtor or a

dependent of the debtor."[13]  This new subsection, however, did not define exactly what

constitutes a "professionally prescribed health aid."

B.  Case Law Defining a "Professionally Prescribed Health Aid"

 A review of the case law reveals that failure to define the term "professionally prescribed

health aid" is a common dilemma.  While a statute may exempt a "professionally prescribed

health aid" from judicial process or the claims of creditors, that term typically is not defined

within the statute.  For example, Bankruptcy Code section 522(d)(9) specifically exempts

"[p]rofessionally prescribed health aids for the debtor or a dependant of the debtor"[14] without

defining the term.  Likewise a number of states—e.g., Oregon,[15] Illinois,[16] Montana,[17] and North

Carolina[18]—use the identical language in their exemption statutes without defining it.  Out of

---

[11] *Id.* at 961 (citing Fla. Stat. § 222.20 (1979)).

[12] *See Norwest Bank Nebraska, N.A. v. Tveten*, 848 F.2d 871, 873 (8th Cir. 1988) (noting that "[w]hen the debtor claims a state-created exemption, the scope of the claim is determined by state law").

[13] § 222.25(2), Fla. Stat. (1993) (enacted pursuant to Session Law 93-256).  The language of this subsection has not changed since its 1993 enactment.

[14] The language exempting professionally prescribed health aids under Bankruptcy Code § 522(d)(9) is identical to section 222.25(2), Florida Statutes, except that the Florida language limits the exemption to "the debtor's interest" in such property.

[15] *See In re Driscoll*, 179 B.R. 664, 665 (Bankr. D. Or. 1995) (quoting Or. Rev. Stat. § 23.160(1)(h), which in 2003, was renumbered to § 18.345(1)(h)).

[16] *See In re Hellen*, 329 B.R. 678, 681 (Bankr. N.D. Ill. 2005) (quoting 735 Ill. Comp. Stat. 5/12-1001(e)).

[17] *See In re Reardon*, 403 B.R. 822, 827 (Bankr. D. Mont. 2009) (quoting Mont. Code Ann. § 25-13-608(1)(a)).  The Montana statutory language differs from the Bankruptcy Code language only in that it refers to the debtor as a "judgment debtor."

[18] *See In re Man*, 428 B.R. 644, 653 (Bankr. M.D.N.C. 2010) (quoting N.C. Gen. Stat. § 1C-1601(a)(7)).

necessity, therefore, a case law definition has evolved.  As is described below, the evolution began with an Oregon bankruptcy court that borrowed principles used to evaluate automobiles claimed as exempt "tools of the trade" used for business activities.  The Oregon court then superimposed these principles over the Internal Revenue Code's definition of deductible medical expenses.  Numerous courts, including Florida, have adopted the Oregon court's resulting definition, and some courts have further modified it as the facts and circumstances required.

    1)  <u>The First Definition - the *Driscoll* Lexus - Oregon</u>

An Oregon bankruptcy court first attempted to define the term "professionally prescribed health aid" in the 1995 case of *In re Driscoll*.  The *Driscoll* debtors had claimed their 1990 Lexus sedan as exempt because the disabled husband debtor, who had a prosthetic right foot, had discovered that "he could satisfactorily operate his Lexus given the amount of space that it had above the pedals and its low speed cruise control."[19]  The *Driscoll* debtors claimed that the full $16,000 value of their Lexus qualified as a professionally prescribed health aid because the "unusual vehicle [met the] debtor's needs under one of the options discussed with [an] occupational therapist."[20]

Even though the language in Oregon's exemption was identical to the language found in the federal exemption under Bankruptcy Code section 522(d)(9), the *Driscoll*  court found no authority that "address[ed] the meaning of the term 'professionally prescribed health aid.'"[21]  The *Driscoll* court thus broke the phrase into two prongs—i.e., "prescribed"[22] and "health aid"— and it looked to outside sources in an attempt to define each.  First, for the meaning of

---

[19] *Driscoll*, 179 B.R. at 665.

[20] *Id.*

[21] *Id.*

"prescribe," the court looked to a legal dictionary, which stated that "[i]n a medical sense[,] 'prescribe' means to direct, designate, or order use of a particular remedy, therapy, medicine, or drug."[23]  Next, for the meaning of "health aid," the court looked to state law cases that had considered automobiles claimed under the personal property exemption for "tools of the trade."[24]

> [A]n automobile cannot be exempted as a tool of a trade under [Oregon law] "unless it is uniquely suited for and principally used in connection with a principal business activity."[25] . . .  It follows that an automobile cannot be exempted as a health aid unless it is <u>uniquely suited and principally used as a health aid</u>.[26]

And finally, to further clarify "health aid," the *Driscoll* court looked to the Internal Revenue Code's definition of allowable deductions for medical care expenses, which included amounts paid

> (A) for the diagnosis, cure, mitigation, treatment, or prevention of disease, or for the purpose of affecting any structure or function of the body, [or]
>
> (B) for transportation primarily for and essential to medical care referred to in subparagraph (A).[27]

Noting that the health aid exemption and the tax deduction for medical expenses served "similar purposes," the *Driscoll* court essentially cobbled together the definition of a "health aid" by superimposing the tools of the trade requirement—i.e., that the asset must be "uniquely suited

---

[22] In its evaluation of "professionally prescribed health aids," the *Driscoll* court did not explicitly address whether a health aid must be "professionally" prescribed, but it did reference that no "health care professional" had prescribed the claimed health aid at issue.  *See id.*

[23] *Id.* (quoting *Black's Law Dictionary* 1064 (5th Ed. 1981)).

[24] *Id.* (citing what is now Or. Rev. Stat. § 18.345(c)).

[25] *Id.* (quoting *In re Lindsay*, 29 B.R. 25, 26 (Bankr. D. Or. 1983)).

[26] *Id.* at 665-66 (emphasis added).

[27] *Id.* at 666 (alteration in original) (citing 26 U.S.C. § 213(d)(1)).

and principally used as a health aid"—over the tax code language.[28]    Under the *Driscoll*

definition, therefore, an asset is exempt as a professionally prescribed health aid if

> (1) a health care professional directs, designates, or orders its use as a particular remedy, therapy, medicine or drug, and
>
> (2) the asset is uniquely suited and principally used for either
>
>> (a) the diagnosis, cure, mitigation, treatment or prevention of disease or for the purpose of affecting any structure or function of the body, or
>>
>> (b) transportation primarily for and essential to medical care.[29]

The *Driscoll* court went on to apply its two-pronged analysis to the debtors' claimed

exemption for their Lexus sedan.  It first found that a health care professional had not, in fact,

"prescribed" the vehicle's use because there was no evidence that the occupational therapist

recommended that particular make or model.[30]    Under the second prong, the court found that the

Lexus failed to qualify as a "health aid" under either subpart (a) or subpart (b).    The court

reasoned that, while the particular Lexus at issue was "suited for use by the debtor given the

limitations imposed by his injury," it did not meet the subpart (a) requirement of "uniquely suited

and principally used for the diagnosis, cure, mitigation, treatment or prevention of disease or for

the purpose of affecting any structure or function of the body."[31]    Similarly, the Lexus failed the

subpart (b) requirement because "there [was] no evidence that the [husband debtor's]

transportation [was] primarily for and essential to medical care."[32]

---

[28] *Id.*

[29] *See id.* at 665-66.

[30] *Id.* at 665 (concluding that the Lexus was, instead, an unmodified vehicle that the debtors owned prior to the husband's injury and, after experimenting with his ability to operate the vehicle, the husband had simply found that it met his needs).

[31] *Id.* at 666.

[32] *Id.*

Significantly, the *Driscoll* court distinguished an automobile from a wheelchair, which while in a sense is used for transportation, is mainly "designed to allow an injured person to approximate normal body function or to compensate for the effect that the injury had on normal body functions."[33]  A wheelchair, therefore, meets the subpart (a) definition of a health aid because it "is for the purpose of affecting the structure or function of the body."[34]  According to the *Driscoll* court, no automobile could qualify as a health aid under subpart (a) because it "is not used for such a purpose."[35]  Implicit in the *Driscoll* opinion is the requirement that an automobile could only meet the subpart (b) definition if it was both uniquely suited and principally used for transportation essential to obtaining medical care.

2)  <u>Florida Courts Adopt the *Driscoll* Definition – *Kirby*, *Allard*, and *Kahn*</u>

The 1998 bankruptcy case of *In re Kirby* was Florida's first published decision that considered a claimed exemption of a professionally prescribed health aid under section 222.25(2), Florida Statutes.[36]  The debtor husband in *Kirby* "require[d] medical treatment at different hospitals throughout the United States," and the debtors claimed an exemption of their motor home, which they used to travel extensively "outside the state of Florida for personal and medical purposes."[37]  Because no authority existed to determine what qualified as a professionally prescribed health aid under the Florida statute, the *Kirby* court looked to the *Driscoll* definition.  Judge Briskman noted that the *Kirby* evidence included "a prescription from a medical doctor that state[d], 'motorhome:  fully equipped with hoist, ceiling track, monitoring

---

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *In re Kirby*, 223 B.R. 825, 829-30 (Bankr. M.D. Fla. 1998).

[37] *Id.* at 827.

system, wheelchair access.'"[38]  He made no finding, however, on the first prong—i.e., whether

the motor home was prescribed—and instead simply noted that "the date the purported

prescription was authorized" was "[c]onspicuously missing from this document."[39]  For the

second prong, Judge Briskman rejected the amicus curiae's proposition that the motor home

qualified as a health aid. [40]  He specifically quoted *Driscoll's* part (2)(a) requirement—i.e., that

the asset must be "uniquely suited and principally used for the diagnosis, cure, mitigation,

treatment or prevention of disease or for the purpose of affecting any structure or function of the

body."[41]  And he parenthetically referenced the *Driscoll* court's disallowance of an automobile

"even though it [was] 'suited for use by the debtor given the limitations imposed by his

injury.'"[42]  Judge Briskman thus concluded that the *Kirby* motor home did not qualify as a

professionally prescribed health aid under section 222.25(2), Florida Statutes.

Seven years after authoring *Kirby*, Judge Briskman again considered the exemption of a

motor vehicle as a professionally prescribed health aid.  In the 2005 case of *In re Allard*, the

debtor claimed an exemption for a modified van "equipped with a wheelchair lift . . . [and]

specifically designed for [her] based on her physical disability."[43]  The court noted that the van

enabled the debtor "to function independently" because it allowed her "to maintain employment,

attend weekly medical appointments, and participate in everyday activities."[44]  Judge Briskman

---

[38] *Id.* at 829.

[39] *Id.* at n.7.

[40] The *Kirby* debtors used the motor home as their primary residence and only sought a determination of whether their motor home was exempt as homestead property.  *Id.* at 827.  The assertion that the motor home qualified as a professionally prescribed health aid was presented in an amicus curiae brief as an alternative basis for exemption. *Id.* at 829.

[41] *Id.* at 830.

[42] *Id.* (citing *Driscoll*, 179 B.R. at 666).

[43] *In re Allard*, 342 B.R. 102, 103 (Bankr. M.D. Fla. 2005).  The *Allard* opinion did not identify the model or claimed value of the van at issue.

[44] *Id.*

distinguished the specifically designed *Allard* van from both the *Driscoll* Lexus, which the debtor had later "discovered" would accommodate his disability,[45] and the *Kirby* motor home, which "was not specifically designed to suit the [*Kirby* debtor's] physical disabilities."[46] Significantly, Judge Briskman noted that while the *Kirby* debtor "may have used alternative means [to get to the doctor,]" the *Allard* debtor did not have such alternatives because the van she used was "converted and specifically designed for [her] to enter and exit."[47]  Judge Briskman reiterated *Driscoll*'s mandate that "[a]n automobile cannot be exempted as a health aid unless it is <u>uniquely situated</u> as a health aid."[48]  He went on to conclude that the *Allard* van was "specifically designed" for the debtor and did, in fact, qualify as a professionally prescribed health aid under section 222.25(2), Florida Statutes.[49]

Almost two years after distinguishing the *Allard* van from the *Kirby* motor home and the *Driscoll* Lexus, Judge Briskman for a third time considered a vehicle claimed as a professionally prescribed health aid.  In the case of *In re Khan*,[50] the debtors sought an exemption for the full value of their 2006 Nissan Armada sport utility vehicle ("SUV").  The unmodified SUV met the debtors' needs because it "contain[ed] three rows of seating where their disabled child [could] sit separate from other children."[51]   The *Khan* debtors argued that the vehicle met the requirements

---

[45] *Id.* at 104 (citing *Driscoll*, 179 B.R. at 666).

[46] *Id.*

[47] *Id.*

[48] *Id.* (emphasis added) (citing *Driscoll*, 179 B.R. at 666).

[49] *Id.*

[50] *In re Khan*, 2007 WL 707376 (Bankr. M.D. Fla. 2007) (not reported).  The *Khan* debtors valued their SUV at $35,000, with nearly $20,000 worth of equity.  *Id.* at *1.

[51] *Id.*  According to the *Khan* debtors,

> [t]he vehicle is designed and utilized to accommodate the Debtors' middle child, age 4 who has Down Syndrome, a permanent medical disability.  Additionally, the vehicle is approved for the "Disabled Persons Parking Identification Permit."

*Id.* (quoting the debtors' Amended Schedule C).

of section 222.25(2) "because a medical professional [had] prescribed them [the handicapped parking permit]."[52]  Judge Briskman rejected this argument and again relied on the *Driscoll* definition.[53]  He found that the SUV was "not uniquely designed to accommodate the Debtors' needs."[54]  Instead, the SUV was "a typical van possessing the same characteristics as any similar van . . . [and did not require any] further adjustments . . . based on their disabled child's needs."[55]  The court thus sustained the trustee's objection to the debtors' claimed exemption of the SUV.

    3)  The *McCashen* Van - an Alternative Definition

In the 2006 case of *In re McCashen*, an Ohio bankruptcy court considered the debtor's claimed exemption for her 2000 Ford Windstar van.[56]  This van had no special modifications or specially installed equipment, nor had it been prescribed by a physician.[57]  According to the debtor, whose self-described physical impairment was obesity,[58] this particular van was the only vehicle she could find that "allow[ed] her the room and flexibility she need[ed] to get in and out of the vehicle, as well as to drive it."[59]  Being without family or friends who could assist her with her transportation needs, she used this particular van "to get to multiple doctors' appointments and fill her prescriptions, as well as to do grocery shopping and generally maintain her independence."[60]  The *McCashen* debtor claimed that because the van was "uniquely suited to

---

[52] *Id.* at *2.

[53] *Id.* (citing *Driscoll*, 179 B.R. at 666).

[54] *Id.*

[55] *Id.*

[56] *In re McCashen*, 339 B.R. 907, 908-910 (Bankr. N.D. Ohio 2006).

[57] *Id.* at 909.

[58] *Id.* at 908.  The *McCashen* debtor was retired on a disability pension, suffered from numerous medical problems, and was then currently under the care of at least five medical doctors.  *Id.* at 909 n.2.

[59] *Id.* at 909.

[60] *Id.*

accommodate her large body size," it was a medically necessary health aid and that she should be entitled to claim its $4000 fair market value as fully exempt.[61]

The *McCashen* court considered the debtor's claim under the Ohio exemption statute, which differs from the federal and state statutes described above. The Ohio statute exempts "professionally prescribed <u>or</u> medically necessary health aids."[62] This language uses the two phrases "professionally prescribed" and "medically necessary" to modify the term "health aid." Most significantly, the two phrases are written in the disjunctive. The *McCashen* court thus structured its two-part inquiry as 1) whether the vehicle was a health aid, and if so, 2) whether it was either professionally prescribed or medically necessary.[63]   The court reviewed the *Driscoll*, *Kirby*, *Allard*, and *Hellen* cases described above but chose not to rely on the *Driscoll* definition for a health aid. Instead, the *McCashen* court evaluated the common dictionary definitions of "health" and "aid" to conclude that "a health aid is something which is useful either to (1) help a debtor attain freedom from disease or pain; or (2) support the debtor's physical or mental well being."[64]   Under this significantly less restrictive definition, the court noted that even an unmodified vehicle could potentially be treated as a health aid if it "facilitate[d] the debtor's efforts to travel to necessary medical appointments."[65]

The *McCashen* court found it unnecessary, however, to determine whether the unmodified van at issue met the first inquiry—i.e., whether it was a health aid—because even if it "stretched" that term to include a standard motor vehicle, the debtor's van could not meet either requirement of the second inquiry—i.e., whether it was professionally prescribed or

---

[61] *Id.* at 909-10.

[62] *Id.* at 910 (quoting Ohio Rev. Code Ann. § 2329.66(A)(7) (emphasis added)).

[63] *Id.* at 911.

[64] *Id.* (citing *Merriam-Webster's Collegiate Dictionary* 26, 574 (11th ed. 2003)).

[65] *Id.* at 912.

medically necessary.[66]  There simply was no evidence that the *McCashen* van had been

professionally prescribed.  Further, under the common dictionary definitions of "medical" and

"necessary," to be medically necessary, "a health aid must be directly related to required

treatment of the debtor's health conditions."[67]  The court found that the *McCashen* debtor's van

"clearly [was] not medically necessary" because it was "not related to the practice of medicine

and [was] not devoted to the debtor's medical care."[68]  Instead, the court found that it was "a

means of transportation to arrive at a facility where medical care is available."[69]  Thus, the

*McCashen* court sustained the chapter 7 trustee's objection to the debtor's claimed exemption of

the van as a medically prescribed health aid.[70]

      4)  <u>The *Hellen* Modified Van and Bicycle - Significant Modifications to *Driscoll*</u>

      In the 2005 case of *In re Hellen*, an Illinois bankruptcy court considered the chapter 7

trustee's objection to exemptions claimed for a 2002 Ford E250 full-size conversion van and a

bicycle.[71]  The husband debtor in *Hellen* was a paraplegic confined to a wheelchair.  To

accommodate his disability, the debtors had customized the van for his transportation needs and

customized the bicycle to enable him to exercise as his physician had recommended.[72]  They

claimed both assets as fully exempt under the Illinois professionally prescribed health aids

statute.  In support of their claim for the modified van, the debtors submitted a "Driver Readiness

---

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] *Id.*

[70] *Id.* at 913.

[71] *In re Hellen*, 329 B.R. 678, 679 (Bankr. N.D. Ill. 2005).  The *Hellen* debtors valued the van and the bicycle at $30,000 and $1000, respectively.  *Id.*

[72] *Id.* at 680.

Evaluation," which was signed by an occupational therapist.[73]  Further, the husband averred in

an affidavit that the van was

> his sole means of transportation for medical and rehabilitation
> appointments, as well as for his day-to-day transportation needs,
> including transportation to work, when he can find employment.[74]

In support of the modified bicycle, the debtors submitted a physician's letter recommending that

the husband exercise regularly.[75]  The *Hellen* trustee argued that neither asset was professionally

prescribed because 1) an occupational therapist—and not a physician—had  signed the Driver

Readiness Evaluation and 2) the physician's letter on the bicycle "merely recommended" regular

physical exercise and did not specifically "direct, designate, or order the use of the bicycle"—a

bicycle that the debtors already owned.[76]

Like Judge Briskman in *Kirby* some ten years before, the *Hellen* court found this to be a

question of first impression, and it, too, relied heavily on *Driscoll*'s definitions and analysis.[77]

The court first considered for each asset whether they had been "professionally prescribed."  The

*Hellen* court looked to various dictionary definitions for the ordinary and plain meaning of the

statute's language and concluded that the state legislature's intent "in drafting the provision was

to require a person possessing skill or experience in a field to recommend or order the use of the

health aids."[78]  The court thus "reject[ed] the trustee's argument that the language of the statute

---

[73] *Id.*

[74] *Id.* (citation to court document omitted).

[75] *Id.*  The letter, which was dated nearly three months after the debtors filed their voluntary bankruptcy petition, "stated that [the husband] was tested, fitted for, and had purchased a custom-made bicycle that afforded him the type of exercise recommended by the physician."  *Id.*

[76] *Id.* at 682.

[77] *Id.* at 682-84.

[78] *Id.* at 683.

requires a *physician's* prescription written *prior to purchase* of the item."[79]  Noting that "many

healthcare professionals can prescribe various remedies for numerous conditions of ill being,"

the court declined to limit the health aid exemption to those prescribed by only a physician when

the state legislature did not see fit to impose this limitation.[80]  And while agreeing that no

professional had prescribed the van or the bicycle prior to their original purchase, the court found

this of no consequence because healthcare professionals had in fact prescribed the later

modifications to both the van and the bicycle so that the husband could use them.[81]

      The *Hellen* court next considered for each asset whether they constituted "health aids."[82]

Again it analyzed the plain and ordinary meaning of this term using dictionary definitions, and

just as the *Driscoll* court had done, it considered the Internal Revenue Code's definition of

"medical care."[83]  The *Hellen* court found that

> the reconfigured van and bicycle are principally utilized for the
> mitigation of  [the husband's] disability, as well as for the
> treatment of that disability. That is, the van affords [the husband]
> the mobility to attend his medical appointments and physical
> therapy sessions, and the bicycle enables him to perform the
> needed exercise for his particular disability. In short, the Court
> holds that *the special modifications and adaptations* installed on
> the van and bicycle in order to accommodate [the husband's]
> special needs are "health aids."[84]

However, despite finding that the van and bicycle as modified were professionally prescribed

health aids, the *Hellen* court rejected the debtors' assertion that the modifications rendered the

---

[79] *Id.* (emphasis added).

[80] *Id.* at 683-84.

[81] *Id.* at 683.

[82] *Id.* at 684.

[83] *Id.* (citing *Driscoll*, 179 B.R. at 666; 26 U.S.C. § 213(d)(1)).

[84] *Id.* (emphasis added).

vehicles exempt in their entirety.[85]  In the most significant modification to the *Driscoll* analysis

to date, the *Hellen* court ruled that "only those portions of the equipment installed on the van and

bicycle to allow [the husband] to use and operate them [were] exempt."[86]

    5)  <u>Recent Applications of the "Modified *Driscoll* Definition"</u>

     In 2009, a Montana bankruptcy court considered the case of *In re Reardon*, in which the

debtor claimed a converted 2007 Dodge Grand Caravan valued at $35,000 as fully exempt under

Montana's exemption for professionally prescribed health aids.[87]  Just three months before filing

bankruptcy, the *Reardon* debtor, who was paralyzed from the waist down and wheelchair bound,

purchased a van "equipped with a wheel chair lift/conversion kit."[88]  By stipulation, the parties

agreed that the van's value "would be significantly reduced if the conversion components were

removed," and that "the interior of the van would primarily [become] a 'shell.'"[89]  They also

agreed that the converted van was the "sole means of transportation" for the debtor—a single

mother—and her daughter.[90]  Without it, the debtor could not "effectively pursue a job, seek

health care assistance, or care for her or her family's needs."[91]  And finally, the debtor offered as

evidence a stipulated letter from her physical therapist that addressed what would likely occur if

the debtor did not have use of the vehicle's chair lift:

---

[85] *Id.* at 685.

[86] *Id.* at 686.  Based on an unrebutted appraisal report that the van's modifications totaled $17,846, the court accepted this amount as the value "properly claimed exempt as a professionally prescribed health aid."  *Id.*  Because the record contained no evidence of the cost of the modifications made to the bicycle, however, the court reserved ruling on what portion of the bicycle could properly be claimed exempt.  *Id.*

[87] *In re Reardon*, 403 B.R. 822, 824 (Bankr. D. Mont. 2009) (citing Mont. Code Ann. § 25-13-608(1)(a)).

[88] *Id.* at 824-25 (noting that a Montana government health services program had provided the debtor with funding for the vehicle based on her disability).

[89] *Id.* at 825 (noting that significant modifications had been made to the van, including removal of many of its interior components and lowering its interior floor).

[90] *Id.*

[91] *Id.*

> [T]ransferring [the debtor] from her [wheelchair] to a car seat
> would be nearly impossible on a regular basis and would lead to
> further breakdown of her upper extremities and low back.[92]

The *Reardon* court considered the plain language of the Montana statute and rejected the chapter 7 trustee's arguments in three respects:  First, it rejected the trustee's assertion that the converted van did not qualify under the exemption statute because a medical professional had not professionally prescribed it.[93]  In this, the *Reardon* court specifically agreed with the *Hellen* court's reasoning and concluded that the recommendation of the debtor's physical therapist satisfied the "professionally prescribed" requirement.[94]  Second, the *Reardon* court rejected the trustee's argument that the van was not a health aid "because it [was] not primarily used for the [d]ebtor's receipt of medical care . . . [but instead] for work and general transportation in addition to health care assistance."[95]  Noting that the van was the debtor's sole means of transportation and noting the physical therapist's statement that the debtor's physical condition would worsen without the van's wheelchair lift, the *Reardon* court adopted the *McCashen* definition of "health aid" and found that the van "helps [the debtor] attain freedom from pain and supports her physical and mental well being."[96]  And third, the *Reardon* court rejected the trustee's argument that it should not allow as exempt the van's entire value, "but rather only the value of the wheelchair conversion kit."[97]  The *Reardon* court rejected this argument in part because despite the trustee's burden under Federal Rule of Bankruptcy Procedure 4003 to prove that the exemption was not properly claimed, the trustee had offered no evidence of the van's

---

[92] *Id.* at 826.

[93] *Id.* at 827.

[94] *Id.* (citing *Hellen*, 329 B.R. at 682-83).

[95] *Id.* at 828.

[96] *Id.* at 829 (citing *McCashen*, 339 B.R. at 911).

[97] *Id*. at 829-30 (citing *Hellen*, 329 B.R. at 686).

value once the wheelchair lift had been removed.[98]  The *Reardon* court thus found that the

trustee had failed to carry his burden, that the converted van had been professionally prescribed,

and that it qualified as a health aid.  The court, therefore, overruled the trustee's objection and

deemed the van's full $35,000 value exempt as a professionally prescribed health aid.

In the 2010 case of *In re Man*, a North Carolina bankruptcy court considered the debtor's

claimed exemption of her modified condominium as a professionally prescribed health aid.[99]

The debtor in *Man* had been "diagnosed with a neuro-toxic illness . . . [that became] so severe

that she could no longer work."[100]  The debtor, suffering from numerous illnesses including

"multiple chemical sensitivity syndrome," testified that a number of doctors had directed her to

avoid environmental irritants and to "create a chemical free environment" in her home.[101]  In

2008, the debtor purchased a condominium for $29,000.  She selected it specifically for certain

characteristics that would allow her "to limit her contact with harmful environmental

influences."[102]  The debtor testified that she spent over $14,000 making numerous modifications

and improvements, all "to accommodate her environmental illness."[103]  In support of her claimed

exemption, the debtor attached a doctor's letter to her original bankruptcy schedule for real

---

[98] *Id.* at 830.

[99] *In re Man*, 428 B.R. 644, 647 (Bankr. M.D. N.C. 2010).

[100] *Id.*

[101] *Id.*  In 2006, the debtor was "diagnosed with toxic encephalopathy . . . [and could not tolerate] chemical cleaners, scented products, perfumes, or dyes[,] and ha[d] to use a water purifier."  *Id.*

[102] *Id.* at 647-48.

[103] *Id.* at 648.  The modifications included buying a new heat pump, replacing the rug floor with ceramic tile to reduce dust, replacing the moldy and water-damaged kitchen counter and cabinets with a stainless steel table, replacing the moldy refrigerator, replacing the moldy and rotted windows, replacing the rusty grills for the heating vents, and putting wire shelving in the closets, presumably to avoid the collection of dust.  *Id.*

property.[104]  The letter described the debtor's medical condition and stated that the "upgrades [to the condominium] were . . . medically necessary."[105]

The *Man* court accepted the debtor's "uncontradicted testimony that it [was] medically necessary for her to live in a chemical free environment."[106]  To evaluate her claimed exemption under the North Carolina statute for professionally prescribed health aids, the court looked to the definitions of "health aid" articulated in both *Driscoll* and *McCashen*.  The *Man* court found that the modified condominium met both tests because it was "uniquely suited to minimize the symptoms of the [d]ebtor's medical condition."[107]  The *Man* court found that the modified condominium had been professionally prescribed because, "although no doctor advised the [d]ebtor where to live," she modified the condominium "at the recommendation of her doctors."[108]  In this finding, the *Man* court explicitly agreed with the *Driscoll* and *Hellen* courts that a written prescription from a medical doctor is not required for an asset to be "professionally prescribed."[109]

Like the *Reardon* court, the *Man* court did not accept, however, the debtor's assertion that the medically necessary modifications made the entire condominium exempt.  The *Man* court noted that the debtor's doctors had "recommended the improvements [but] not the purchase of the [c]ondominium itself.[110]  Moreover, the court found that allowing the modifications to exempt the property in its entirety "would stretch North Carolina's health aid exemption beyond

---

[104] *Id.*

[105] *Id.*

[106] *Id.* at 654.

[107] *Id.*

[108] *Id.* at 655.

[109] *Id.* (citing *Driscoll*, 179 B.R. at 655; *Hellen*, 329 B.R. at 683).

[110] *Id.*

the intention of the legislature and lead to absurd results."[111]  The *Man* court, therefore, sustained

the chapter 7 trustee's objection, in part, and limited the debtor's health aid exemption to

$11,000—i.e., the total value of the modifications for which the debtor had invoices and which

were, in the court's discretion, "directly related to the Debtor's medical condition."[112]

C.  Application of the Law to This Case

The analysis in this case begins with the first prong under the *Driscoll* definition—i.e.,

whether the asset claimed as exempt has been professionally prescribed.  The parties stipulated at

a hearing on the Trustee's Objection that the Debtor's medical doctor had written a prescription

for a "Steering Wheel Spinner Device" on February 8, 2010, just seven weeks prior to the

bankruptcy filing.  The Court rejects the Trustee's argument that the physician's prescription is

somehow invalid because the prescription was not written and the spinner was not attached until

after the appraisal but before the bankruptcy filing.[113]  This court agrees with the *Hellen* court

and finds the timing of the prescription is not disqualifying.[114]  The Florida legislature has not

seen fit to restrict the exemption to only those health aids that were purchased after being

professionally prescribed.  Nor has the legislature excluded health aids prescribed shortly before

a debtor files bankruptcy.  This Court, therefore, declines to impose any such restrictions.  It

finds that the spinner device at issue in this case meets the first prong of the *Driscoll* definition

because it was professionally prescribed.

The doctor's prescription does, however, raise an important distinction:  the prescription

is for the spinner device only, yet the Debtor has claimed the entire vehicle exempt as a

---

[111] *Id.*

[112] *Id.* at 656 (disallowing some of the modifications because the court "agree[d] with the [t]rustee that many of the modifications made by the [d]ebtor might well have been made by any new owner").

[113] *See Trustee's Objection*, Doc. No. 12.

[114] *See Hellen*, 329 B.R. at 683 (noting that the Illinois legislature did not impose any conditions on the exemption).

professionally prescribed health aid.  As the Trustee argues, the medical doctor did not prescribe the vehicle.  But there is an argument to be made that adding the spinner device to the vehicle allows the Debtor to use the vehicle as the doctor prescribed.  The critical question is whether the prescription for the spinner device can, in effect, transform the entire vehicle into a professionally prescribed health aid.

The Court finds that the spinner device, when considered alone, clearly meets subpart (a) of *Driscoll's* second prong—i.e., whether the asset is "uniquely suited and principally used for . . . the . . . mitigation of disease or for the purpose of affecting any structure or function of the body."[115]  A spinner knob's purpose is "to make steering with one hand less difficult."[116]  Like a crutch that assists or approximates walking, a spinner device assists the physically impaired driver by replacing the functionality enjoyed by non-disabled drivers, who have the full use of their hands, wrists, and arms.  In this case, the spinner device effectively mitigates the Debtor's disability or physical impairment, at least with respect to driving a vehicle.  The Court is not aware of any other uses for a spinner device and thus finds that it is uniquely suited and principally used for this purpose.

The Court cannot, however, extend this finding and allow it to transform the entire vehicle into a health aid.  Other than the spinner device, the Debtor did not present any evidence that the Vehicle at issue has been modified in any way such that it is uniquely suited to mitigate, treat, or prevent disease or to affect the structure or function of the body—i.e., subpart (a) of *Driscoll*'s second prong.  The Debtor did argue that this is her exclusive means of transportation for both her and her elderly mother.  This includes transportation to medical appointments and

---

[115] *See Driscoll*, 179 B.R. at 665-66.

[116] Wikipedia, http://en.wikipedia.org.wiki/Brodie_Knob (last visited July 26, 2011) (noting that since the advent of power steering, "wheel-spinners" are mainly utilized in semi trucks, forklifts, and riding lawnmowers; and "are also used for helping people with disabilities . . . to drive automobiles").

for many other daily needs.  The Debtor, however, did not present any evidence that this particular Vehicle is uniquely suited and primarily used for transportation essential to medical care—i.e., subpart (b) of *Driscoll*'s second prong.

Moreover, the Court can only conclude that the Debtor could likely use any functional vehicle, not just this particular Vehicle, to meet her transportation needs, as long as she could attach the spinner device to the steering wheel.  The fact that the spinner device can be removed and installed quite easily presents an inherent problem.  Although there is absolutely no indication in this case of any attempt to gain an excessive benefit to which the Debtor is not entitled, allowing a spinner device's qualification as a health aid to extend and transform the entire car into a health aid would violate the Florida Legislature's intent in providing an exemption—i.e., to provide the honest debtor with property useful to basic survival.  Simply put, allowing this honest Debtor to exempt the entire Vehicle by attaching a spinner device would open the door to a dishonest debtor's attempt to exempt any range of vehicles from a Maserati convertible to a luxury motor coach.  As cruel as this reality may be, the Florida Legislature has seen fit to provide in section 222.25(1), Florida Statutes, a maximum $1000 exemption for a single vehicle to meet a debtor's transportation needs.[117]  The Court concludes that it is this $1000 automobile exemption that applies to the transportation needs and circumstances of the in Debtor in this case.  This $1000 limit cannot be increased by simply attaching a spinner device to the steering wheel.

## Conclusion

Having found that the spinner device alone, and not the entire vehicle, meets both prongs of the *Driscoll* definition for a professionally prescribed health aid, the Court adopts the

---

[117] Since 1993, when the Florida Legislature first provided for the motor vehicle exemption under section 222.25(1), Florida Statutes, it has not seen fit to raise the initial $1000 value limit.  *See* 1993 Fla. Sess. Law Serv. Ch 93-256 (West).

modified *Driscoll* definition that was first applied to the modified van and bicycle in *Hellen* and then applied to the modified condominium in *Man*.  The Court finds that only the modification itself—in this case, the spinner device alone—is exempted under section 222.25(2), Florida Statutes, as the Debtor's interest in a professionally prescribed health aid.  Accordingly, it is

**ORDERED**:

1.      The Debtor's Motion for Reconsideration (Doc. No. 18) is GRANTED in part to the extent set forth in this Order.

2.      The Trustee's Objection (Doc. No. 12) is SUSTAINED in part as to the Vehicle, and OVERRULED in part as to the spinner device alone.

**DONE** and **ORDERED** in Chambers at Tampa, Florida, on September 22, 2011 _____.

_____
Michael G. Williamson
United States Bankruptcy Judge


Copies to be provided by CM/ECF service.